UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DENISE HUGHES and BOB HUGHES,

                            Plaintiffs,                         Case Number 04-10355-BC

v.                                                      Honorable David M. Lawson

REGION VII AREA AGENCY ON AGING,
a Michigan municipal corporation; BRUCE KING,
individually and as Executive Director of Region
VII Area Agency on Aging; DREW ORVOSH,
individually and as Assistant Director of Region
VII Area Agency on Aging; BRIAN K. EDLER;
and LEARMAN, PETERS, SAROW &
McQUILLAN, P.L.C.,

                            Defendants.

_____/

**OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION
OF MAGISTRATE JUDGE, DENYING MOTIONS FOR SUMMARY JUDGMENT
AND SANCTIONS, DISMISSING CLAIMS OF PLAINTIFF BOB HUGHES
FOR WANT OF JURISDICTION, DENYING AS MOOT PLAINTIFFS' MOTION
TO ENLARGE TIME TO RESPOND TO SANCTIONS
MOTION, AND SETTING SCHEDULING CONFERENCE**

This matter is before the Court on a report filed by Magistrate Judge Charles E. Binder

recommending that the defendants' motions for summary judgment be granted and a motion for

sanctions under Federal Rule of Civil Procedure 11 be denied. Plaintiff Denise Hughes was fired

from her job at Region VII Area Agency on Aging allegedly for commenting on matters of public

concern. She filed a claim for violation of her First Amendment rights pursuant to 42 U.S.C. § 1983.

Her husband, Bob Hughes, also joined in the complaint with his separate claims against the Region

VII Agency and its officials plus their attorney alleging defamation and tortious interference with

business relations. The Region VII defendants moved for summary judgment against Denise

Hughes' claim on the ground that Region VII is not a state actor and they did not act under color of

law.  They also seek Rule 11 sanctions.  The other defendants moved for summary judgment on the defamation and tortious interference claims.  Magistrate Judge Binder concluded that Region VII is not an agency of the State or its political subdivisions and presumably its employees therefore did not act under color of law when they terminated plaintiff Denise Hughes' employment.  He recommended that the defendants' motions for summary judgment be granted, the federal claims be dismissed with prejudice, the Court decline to exercise supplemental jurisdiction over the state law claims and that they be dismissed without prejudice, and the motion for sanctions be denied.  The plaintiffs filed timely objections to the recommendation and report, and the Court has conducted a *de novo* review of the motions.  The Court now finds that it cannot agree with the magistrate judge's conclusions that the Region VII defendants were not acting under color of law when they terminated plaintiff Denise Hughes's employment because of the overwhelming evidence otherwise.  The Court also concludes it has no subject matter jurisdiction over the claims of Bob Hughes.  Therefore, the Court will deny the defendants' motions for summary judgment, dismiss the claims of plaintiff Bob Hughes for want of jurisdiction, deny the motion for Rule 11 sanctions for lack of merit, and deny the plaintiffs' motion to enlarge time for responding to the sanctions motion as moot.

## I.

Denise Hughes was employed by Defendant Region VII Area Agency on Aging as a program coordinator and public relations person from January 2002 until August 2004.  Plaintiff Bob Hughes, her husband, is a broadcaster for a local radio station.

According to the Agency defendants, Region VII Area Agency on Aging is a Michigan non-profit corporation.  It originally was incorporated by three private individuals, but its organization was later changed to a membership basis.  The members of the corporation are the City of Saginaw

and ten Michigan counties:  Bay, Clare, Gladwin, Gratiot, Huron, Isabela, Midland, Saginaw, Sanilac, and Tuscola.   The Agency receives almost all of its funding from the state and federal governments.  The members each pay a small membership fee.

The Agency is governed by a board of directors.  Each of the eleven local governmental units appoints a representative to the board for staggered three-year terms.  The board members are not required to be employees of their respective unit of government; however, of the eleven board members appointed by Saginaw and the counties, four are public officials.  The members also elect their officers each year by majority vote.  Officers may be removed by a majority vote at any time. The board of directors appoints an executive director, who is responsible for the day-to-day operation of the Agency, and he makes employment decisions.

In May 2004, Ms. Hughes reported the behavior of defendant Bruce King, executive director of the Agency, to a reporter for the Bay City Times.  It is unclear from the amended complaint and the motion papers exactly what Ms. Hughes told the reporter about Mr. King.  On June 30, 2004, Ms. Hughes was reprimanded by defendant Drew Orvosh, assistant director of the Agency, for making inappropriate remarks to employees and violating the Agency's HIPAA rules.  She claims the reprimand was retaliation for her report to the newspaper.  Mr. Orvosh then put a memo in Ms. Hughes' personnel file stating that Ms. Hughes had threatened to have her husband talk about the Agency's treatment of his wife on his radio show.  Ms. Hughes denies making such a comment to Mr. Orvosh.

Ms. Hughes was terminated on August 6, 2004.  According to the defendants, Ms. Hughes was terminated "after a long period of counseling, disciplinary action and suspension for various performance issues."  Learman Defs.' Mot. Summ. J. at 6.  That same day, defendant Brian Elder,

an attorney working for the firm Learman, Peters, Sarow & McQuillan and representing the Agency, sent a letter to Scott Meier, Mr. Hughes' manager at the radio station. The letter indicated that the Agency would take legal action against the radio station if the radio station defamed the Agency.

The present lawsuit was filed on December 16, 2004, and an amended complaint was filed on March 14, 2005. In count one, Ms. Hughes seeks recovery for herself alone on the ground that she was reprimanded and ultimately terminated from her job in retaliation for reporting to the media what she believed to be statutory and administrative rules violations committed by the defendant Region VII Area Agency on Aging and defendant Bruce King, its executive director. The claim is directed against Region VII, King, and Drew Orvosh, the Region VII Assistant Director who notified Ms. Hughes of her termination. Ms. Hughes claims that her termination was in violation of her First Amendment right to freedom of speech and section 1983.

Count two is filed on behalf of Bob Hughes alone and alleges libel. Mr. Hughes claims that the letter sent to his employer, radio station WHNN, contained false information about him that tended to harm his reputation. Mr. Hughes alleges that the law firm employing defendant Elder and the Agency defendants are vicariously liable for defendant Elder's actions. Count two names Region VII, Elder, and his law firm, Learman, Peters, Sarow & McQuillan. Counts three and four of the amended complaint allege claims of intentional interference with a contractual relationship and intentional infliction of emotional distress, respectively. Like count two, these counts are brought on behalf of Bob Hughes alone and name the same defendants. Counts three and four were dismissed by stipulation on July 1, 2005.

The Region VII defendants and the Learman defendants each have filed a motion for summary judgment. The Agency defendants argue that count one by Denise Hughes should be

-4-

dismissed because the Agency is not a public actor and therefore not subject to the First Amendment or section 1983.  The Learman defendants argue that count two by Bob Hughes should be dismissed because the complaint fails to state a claim upon which relief can be granted.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim.  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party."  *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).  Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Thus

-5-

a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

-6-

The United States District Court Judge may refer dispositive motions to a magistrate judge and direct him to submit a report recommendation as to a disposition of the motion pursuant to 28 U.S.C. § 636(b)(1).  Thereafter, "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Ibid.*

A.

Plaintiff Denise Hughes's claim that the Agency defendants violated her First Amendment rights is brought pursuant to 42 U.S.C. § 1983, under which the plaintiff must prove (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law.  *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir. 2003).  She argues that since she was a municipal employee, the second component of the claim is satisfied.  However, the Agency defendants vigorously dispute the contention that the Agency is a public body and that they are state actors.

The Agency denies that it is a public corporation because it was not founded or owned by the state, and it is not governed by managers who derive their authority from the state.  Rather, it was organized through the Nonprofit Corporation Act, just like any other nonprofit corporation.  It insists that the majority of its board members are not government representatives, and it does not manage or control public property, nor does it carry out governmental functions.

The magistrate judge agreed with the defendants that Region VII is a private entity, not a government actor.  He also does not believe the Agency has exercised powers traditionally reserved to the State or that the State coerced the Agency to fire Ms. Hughes or participated in the firing.

-7-

When the Magistrate discussed the nexus test, he quoting extensively from *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000). The magistrate judge concluded that the Agency's activity was not intertwined with state activity because other private non-profit corporations operating on government land and supported almost entirely with government funds do not qualify for state action under section 1983. When he found the Agency to be a private actor not influenced by the government in its decision, the magistrate judge recommended dismissing count one because the plaintiff could not prove that the Agency defendants acted under color of law when they fired her.

The plaintiff objected to this recommendation, arguing that the Agency is a public body because Michigan law does not permit counties and cities to form private corporations; rather, Michigan law prescribes a mechanism for separate units of government to enter into a cooperative venture through a new public body. In addition, the plaintiff states that even if Region VII is not considered a public body, the Court should find state action because the Agency is "entwined with governmental policies" and has been delegated a public function by the state.

It is beyond dispute that the plaintiff must prove state action in order to succeed on a section 1983 claim.

> The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." . . . To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor."

*West v. Atkins*, 487 U.S. 42, 49 (1988).

The Region VII Agency came into being as the result of a Congressional initiative that was launched in 1965 in order to secure for older Americans "[a]n adequate income in retirement,

-8-

. . . [t]he best possible physical and mental health . . . without regard to economic status, . . . suitable housing, . . . a comprehensive array of community-based, long-term care services adequate to appropriately sustain older people in their communities and in their homes, . . . [o]pportunity for employment, . . . [r]etirement in health, honor, dignity after years of contribution to the economy, . . . [e]fficient community services, . . . [f]reedom, independence, and the free exercise of individual initiative in planning and managing their own lives." 42 U.S.C. § 3001. That year, Congress passed the Older Americans Act, 42 U.S.C. § 3001 *et seq.*, which has been amended several times. The Act established an Administration on Aging to carry out the mandate of the Act. 42 U.S.C. § 3011. Through the Act, the federal government gives money to the States to help older people. The Act requires each State to create a state agency. 42 U.S.C. § 3025. The state agency is required to "divide the State into distinct planning and service areas." 42 U.S.C. § 3025(a)(1)(E). The state must then "designate for each such area . . . a public or private nonprofit agency or organization as the area agency on aging [AAA] for such area." 42 U.S.C. § 3025(a)(2)(A). Both public agencies and private non-profit agencies therefore may be designated as AAAs. *See Appalachian Agency for Senior Citizens v. Bland*, 775 F. Supp. 191, 195 (W.D. Va. 1991) (of five AAAs suing state, "Three of the AAAs . . . were formed by cooperating local governments pursuant to Va. Code Ann. § 15.1-21 (Cum. Supp.1991). The remaining two AAAs . . . are private non-profit corporations").

In 1981, Michigan passed the Older Michiganians Act. Mich. Comp. Laws § 400.581 *et seq.* The Act established a commission on services to the aging. Mich. Comp. Laws § 400.583. The commission is required to "[d]esignate planning and service areas and an agency which shall be recognized as an area agency on services to the aging within each planning and service area." Mich. Comp. Laws § 400.584(i). "The commission . . . is the policy-making body for the OSA [Office of

-9-

Services to the Aging] and the fourteen regional AAAs in Michigan." *Detroit Area Agency on Aging v. Office of Services to the Aging*, 210 Mich. App. 708, 710, 534 N.W.2d 229, 231 (1995). "[T]he fourteen AAAs are subordinate to, and subject to the supervision of, the commission." *Id.* at 713, 534 N.W.2d at 232. The state act also creates an Office of Services to the Aging (OSA). Mich. Comp. Laws § 400.585. The OSA "administer[s] the state plan required by the older Americans act of 1965." Mich. Comp. Laws § 400.586(b). The state act allows any of the following types of organizations to act as an area agency on aging (AAA):

> (a) An established office on aging located within the region to be served by an area agency on aging.
> (b) An office or agency of a unit of local government that is designated for the purpose of serving as an area agency on aging by the chief elected official of that unit of government.
> (c) An office or agency designated by the appropriate chief elected officials of a combination of units of local government.
> (d) A public or nonprofit private agency, except a regional or local agency of the state, that is under the supervision or direction of the state agency.

Mich. Comp. Laws § 400.589(1). The state act then lists the duties and powers of the AAA, which include administering an area plan, entering into contracts, and serving as an advocate for older persons. Mich. Comp. Laws § 400.589(2). The OSA is required to "[s]upervise, monitor, assess, evaluate, and provide technical assistance to area agencies on aging." Mich. Comp. Laws § 400.586(k).

The state act gives the OSA and the Commission the authority to promulgate rules. Mich. Comp. Laws § 400.591. The OSA rules again limit the manner in which an AAA may be formed:

> (2) Area agencies shall be established with a statutory basis as 1 of the following:
> (a) A general purpose government or agency thereof.
> (b) An agency designated by resolution of a combination of units of general purpose government.
> (c) A nonprofit agency under the supervision or direction of the state agency.
> (d) An Indian tribal organization.

Mich. Admin. Code r. 400.20401(2). The rules are very specific about what AAAs may and may not do. *See* Mich. Admin. Code r. 400.20101 - 400.20615.

Region VII Area on Aging was formed in 1975. The articles of incorporation state that the incorporators were three private individuals and the Agency was organized as a non-profit domestic corporation. Such organization was consistent with section 400.589(1)(d) of the Michigan statutes and administrative rule 400.20401(2)(c). However, in 1997, the articles of incorporation were amended and the Agency was re-organized on a membership basis, as noted above. The members exclusively became the units of government mentioned earlier. That reorganization also was allowed by the Older Michiganians Act and the administrative rules. *See* Mich. Comp. Laws § 400.589(1)(c) (allowing a AAA to be "[a]n office or agency designated by the appropriate chief elected officials of a combination of units of local government"); Mich. Admin. Code r. 400.20401(2)(b) (stating that area agencies may be "[a]n agency designated by resolution of a combination of units of general purpose government").

The plaintiffs argue that the counties have no authority to form a private non-profit corporation. That argument is based on the well-established premise that "'local governments have no inherent powers and possess only those limited powers which are expressly conferred upon them by the state constitution or state statutes or which are necessarily implied therefrom.'" *Michigan Mun. Liab. and Prop. Pool v. Muskegon County Bd. of County Road Comm'rs*, 235 Mich. App. 183, 190, 597 N.W.2d 187, 191 (1999) (quoting *Hanselman v. Wayne Co. Concealed Weapon Licensing Bd.*, 419 Mich. 168, 187, 351 N.W.2d 544 (1984)). The plaintiffs state that the only statute authorizing counties to act in this manner is the Urban Cooperation Act (UCA), Michigan Compiled Laws section 124.501 *et seq*.

-11-

The plaintiffs point to the decision of the Michigan Court of Appeals in *Detroit Area Agency on Aging v. Office of Services to the Aging*, 210 Mich. App. 708, 534 N.W.2d 229 (1995), in support of their argument, but that case does not directly answer the question presented here. In that case, the plaintiff agency sued the OSA because of a reduction in funding enacted by the Commission. The agency argued that the Commission's decision was unlawful because eight commissioners were ineligible to vote under the Incompatible Public Offices Act, Michigan Compiled Laws section 15.181 *et seq*. In that case, the commissioners agreed that they were public officers, and the court of appeals found that several of them did hold incompatible positions. The case does not discuss the make-up of the Detroit AAA, and the admissions by the defendant obviated the need for the court to discuss the issue currently before this Court.

The UCA authorizes public agencies (defined to include counties in Mich. Comp. Laws § 124.502) to work together with other public agencies to exercise "any power, privilege, or authority that the agencies share in common that each might exercise separately." Mich. Comp. Laws § 124.504. The UCA specifically states that any entity created pursuant to the act is "a public body" that "shall not operate for profit." Mich. Comp. Laws § 124.507. In fact, the Michigan Attorney General has stated that "non-profit corporations may not be used by counties as a means of implementing interlocal government efforts in lieu of the statutes specifically regulating such activities." Att'y Gen. Op. 5750 (1980). Clinton, Eaton, and Ingham counties used the UCA to form an area agency on aging.

However, the Michigan Attorney General also has published a confusing opinion regarding the powers of cities and counties to form corporations. The opinion confirms the basic rule that "in the absence of constitutional or statutory provisions, a county has no authority to [form a private

-12-

nonprofit corporation]." Att'y Gen. Op. 6563 (1989). But that same opinion also states that "there would appear to be nothing that would prevent the county or other local units of government from becoming members of a private nonprofit corporation and paying dues in an amount that reasonably relates to the services provided to the governmental units." *Ibid.* For the latter proposition, the attorney general cited *Hays v. City of Kalamazoo*, 316 Mich. 443, 25 N.W.2d 787 (1947). In that case, the city of Kalamazoo joined the Michigan Municipal League, a nonprofit corporation with membership consisting of 283 Michigan cities and villages. The city paid annual dues to the League of $500. The plaintiff was a tax payer who claimed the city was not authorized by statute or the constitution to make such payments to a corporation. The Court held that the city's payment to the League was permitted because "the welfare of the city was thereby served and, hence, that the purpose was a city public purpose." *Hays v. City of Kalamazoo*, 316 Mich. 443, 458, 25 N.W.2d 787, 792 (1947).

The Court believes that the Agency is a public body because after the 1997 reorganization it cannot be a private non-profit corporation under Michigan law. The Michigan Attorney General has stated on several occasions that counties may not form private non-profit corporations without constitutional or statutory authorization. *E.g.* Mich. Att'y Gen. Op. 5780 (1980). To the extent that Michigan Attorney General Opinion No. 6563 suggests otherwise, it is unpersuasive and not supported by the decisional or statutory authority. Although *Hays v. City of Kalamazoo* approved of a city that had joined a non-profit corporation, the city's membership in the corporation was not what the plaintiff in that case was challenging. Rather, the plaintiff challenged the city's payment of dues to the corporation; the case held that such payments may be made if they promote the city's

-13-

welfare.  That is the proposition for which this case is often cited.  It does not authorize municipalities to form private corporations absent statutory authorization.

As the Attorney General has clearly stated, "The question of whether a county has the authority to form a private nonprofit corporation has been addressed in numerous prior opinions. Each of these opinions has concluded that in the absence of constitutional or statutory provision, a county has no authority to do so."  Mich. Att'y Gen. Op. 6563 (1989).  The defendants have not pointed to any statute authorizing counties to form a private nonprofit corporation to perform the work of an AAA.  Nor has the Court found one, which leads ineluctably to the conclusion that counties are not authorized to form such a corporation.

The defendants argue that this lack of authorization is irrelevant because the counties here did not form the corporation.  The corporation was formed by three individuals in 1975, and it merely amended its articles of incorporation in 1985 to reflect a change in membership.  However, from that point on, the only members of the corporation were counties and the City of Saginaw. Currently, the corporation is formed by eleven members, all of which are government entities.  The Agency is governed by a board comprised exclusively of government appointees.  The Court finds no meaningful difference in the present context between the act of incorporating and the wholesale reorganization of a corporate entity.  If counties are not permitted to form private non-profit corporations, then they likewise are not permitted to take over and reorganize an existing corporate entity; these counties have exceeded their authority.  The Court finds, therefore, the Region VII Agency is a public body.

The magistrate concluded that the Agency is a private entity in one paragraph on page 8 of his report.  He cites no statute or case law but states merely that he "can discern no intent on the part

-14-

of Congress to convert private entities which receive funding under this [Older Americans] Act into governmental agencies." *Ibid.* That statement assumes rather than decides that the corporation is a "private entity." The Court agrees that the Older Americans Act does not convert private entities into state actors. In fact, under the OAA, both public agencies and private non-profit agencies may be designated as AAAs. 42 U.S.C. § 3025(a)(2)(A); s*ee also Appalachian Agency*, 775 F. Supp. at 195. But that does not answer the question here, which is whether Region VII is a public agency or a private non-profit agency. As discussed above, the lack of authority for these counties to form such a corporation leads the Court to conclude that the Region VII Agency is a public actor. In fact, it is difficult under the facts of this case to reach the contrary conclusion. Although the Agency was incorporated as if it were a private non-profit corporation, the only members of the Agency now are eleven government entities. These government entities enacted the Articles of Incorporation that govern the agency. The members may amend the Articles at any time by a two-thirds vote. Each government member appoints its delegate to represent it on the Agency's board of directors. The counties' appointees also elect officers by majority vote and can remove those officers at any time by another vote. The Articles state that "Region VII is established pursuant to Title III of the Older Americans Act of 1965." Agency Defs.' Mot. Summ. J., Ex. B, Articles of Incorporation, Art. II, § 1. Every decision made by Region VII can be directly or indirectly attributed to one of the members, all of whom are government entities. Defendant Bruce King, the Agency's director, derives his authority from this consortium of city and county governments, which is responsible for his actions. *See West*, 487 U.S. at 49.

Even if the Agency is not found to be a public body, the Agency's director cannot avoid a determination that his official action was under color of law because the Agency's activities were

-15-

entwined with public institutions and public officials. The leading case on that point is *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), which was not discussed by the magistrate judge in his report. In *Brentwood Academy*, the Supreme Court held that an Athletic Association, a not-for-profit membership corporation, was a state actor for purposes of section 1983. Eighty-four percent of the Association's members were public schools. The remaining members were private schools. The Association was operated by two committees, the legislative council and the board of control. The members of the committees were administrators from the member schools. The Association enacted rules that its member schools were required to follow, including a rule prohibiting the use of "undue influence" in recruitment activities. When the board of control found that one of the member schools, Brentwood Academy, a private school, violated the undue influence rule, the Association put the school on probation and would not let the school compete in the playoffs for two years. All the members of the board of control were administrators from public schools. The school sued the Association, claiming the penalty amounted to state action in violation of the First and Fourteenth Amendments. The Supreme Court agreed that the Association should be considered a state actor. The Court explained:

> The nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it.
>
> The Association is not an organization of natural persons acting on their own, but of schools, and of public schools to the extent of 84% of the total. Under the Association's bylaws, each member school is represented by its principal or a faculty member, who has a vote in selecting members of the governing legislative council and board of control from eligible principals, assistant principals, and superintendents.

*Id.* at 298.   The Association was "an organization overwhelmingly composed of public school officials who select representatives (all of them public officials at the time in question here), who in turn adopt and enforce the rules that make the system work." *Id.* at 299.

The facts of *Brentwood Academy* remarkably parallel the present case.   The Supreme Court held that the Athletic Association in *Brentwood* was a public actor even though only eighty-four percent of its members were public schools.   In the present case, one hundred percent of the Agency members are government entities.   The Region VII Agency is designated by the state commission as an area agency on aging.   See 42 U.S.C. § 3025(a)(2)(A); Mich. Comp. Laws § 400.583.   "The Commission . . . is the policy-making body for . . . the fourteen regional AAAs in Michigan," including Region VII.   *Detroit Area Agency on Aging*, 210 Mich. App. at 710, 534 N.W.2d at 231. The Region VII Agency is "subordinate to, and subject to the supervision of, the commission."  *Id.* at 713, 534 N.W.2d at 232.   The State Office of Services to the Aging must "[s]upervise, monitor, assess, evaluate, and provide technical assistance to" the Region VII Agency.   Mich. Comp. Laws § 400.586(k).   The state and local governments in Michigan are at least as entwined with the Region VII Agency as were the public school districts in *Brentwood*.   The Agency, therefore, must be considered a state actor for purposes of section 1983.

The magistrate judge cited *Bailey v. Area Agency on Aging of Southeast Arkansas, Inc*., No. 95-2524, 1996 WL 102435 (8th Cir. 1996) (unpublished), for the proposition that employment decisions by a private non-profit entity receiving OAA funds are not state actors for the purposes of 42 U.S.C. § 1983.   However, that organization does not appear to be constituted entirely of governmental entities.   In addition, the state of Arkansas has not enacted a comprehensive statutory scheme governing the operation of its AAAs, as Michigan has.   A search of Arkansas' statutes did

-17-

not reveal any act even remotely similar to the Older Michiganians Act.  Since *Bailey* contains no information about the operation of the AAA at issue in that case or the state's involvement and supervision of the AAA, it cannot serve as a useful precedent here.

The Court rejects the magistrate judge's conclusion that the termination of plaintiff Linda Hughes did not constitute an act under color of law.  The Court believes that there is substantial evidence to the contrary.  Therefore, the Agency defendants' motion for summary judgment will be denied.

B.

The Learman defendants also have moved for summary judgment on plaintiff Bob Hughes's claims.  The magistrate judge did not reach the merits of those arguments; rather he recommended that the Court not retain jurisdiction and dismiss the claims without prejudice to the plaintiff pursuing them in state court.  *See* 28 U.S.C. § 1367(c).  However, before the Court can reach the issue of discretionary dismissal, the Court must find that it has jurisdiction over plaintiff Bob Hughes's state law claims initially.  "The first and fundamental question presented by every case brought to the federal courts is whether it has jurisdiction to hear a case, even where the parties concede or do not raise or address the issue." *Douglas v. E.G. Baldwin & Assocs., Inc.*, 150 F.3d 604, 606-07 (6th Cir. 1998).  Although neither party has challenged subject matter jurisdiction, the Court has an independent duty to determine its power and authority to proceed "[b]ecause lack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile." *Brown v. Francis*, 75 F.3d 860, 864-65 (3d Cir. 1996); *see also Her Majesty the Queen in Right of the Province of Ontario*, 874 F.2d 332, 339 (6th Cir. 1989); *Douglas*, 150 F.3d at 607 (reiterating that "[q]uite aside from whether the parties raise jurisdictional issues themselves – or

-18-

even attempt to consent or agree to federal jurisdiction – federal courts have an independent obligation to investigate and police the boundaries of their own jurisdiction").

Plaintiff Bob Hughes has brought claims that arise only under state law.  Since the parties are not diverse and the claims do not arise under the Constitution or federal law, Bob Hughes has presented no independent basis for federal jurisdiction.  He could not by himself bring these claims in federal court.  Before Congress amended the jurisdictional statutes in 1990, it is clear that Bob Hughes could not join these claims in a lawsuit properly brought in federal court by another party because "a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties." *Finley v. United States*, 490 U.S. 545, 556 (1989).

In 1990, Congress added 28 U.S.C. § 1367 which "overturned the result in *Finley*." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2619 (2005).  As a result of that new section, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a).  Now, even though he could not bring his own claim in federal court, Bob Hughes can join the case as a co-plaintiff as long as his claims "form part of the same case or controversy under Article III of the United States Constitution" as the claims of his wife.

The Supreme Court has counseled that lower courts "must not give jurisdictional statutes a more expansive interpretation than their text warrants; but it is just as important not to adopt an

artificial construction that is narrower than what the text provides." *Exxon Mobil*, 125 S. Ct. at 2620. And there is a clear body of precedent discussing the term "same case or controversy" in the context of federal jurisdiction over state law claims. In *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), the Supreme Court explained the theoretical basis for pendent jurisdiction, a concept subsumed in the contemporary phraseology of "supplemental jurisdiction":

> [It] lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.

*United Mine Workers*, 383 U.S. at 726 (footnotes and citation omitted). In that case, the Court recited four factors to assess in determining if a state law claim fell within the "same case or controversy" as the adjoining federal claim:

> (1) there must be a federal claim; (2) the relationship between the federal claim and the state claim must be such that it permits the conclusion that the entire action comprises but one case; (3) the federal claim must have sufficient substance to confer subject matter jurisdiction; and (4) the federal and state claims must derive from a common nucleus of operative fact.

*Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047, 1054 n.8 (6th Cir. 1986) (citing *United Mine Workers*, 383 U.S. at 725). The Sixth Circuit Court of Appeals has stated that claims derive from a common nucleus of operative fact if they "revolve around a central fact pattern." *Blakely v. United States*, 276 F.3d 853, 861 (6th Cir. 2002) (quoting *White v. County of Newberry, S.C.*, 985 F.2d 168, 172 (4th Cir. 1993).

In this case, the claim of Bob Hughes for defamation does not derive from his wife's wrongful termination claim. Rather, Bob Hughes seeks to join the case with a new, independent, free-standing civil action of his own. The treatment of which Bob Hughes complains by the Region

VII Agency management and its lawyers is distinct and independent of the retaliation described in the amended complaint by Denise Hughes.  Bob Hughes's claims involve no overlapping legal elements or questions of law.  There may be a common question of fact, that is, whether Denise Hughes conveyed a threat of public exposure to Region VII Agency management, but that question is a minor point in the section 1983 claim and cannot be described fairly as comprising the "nucleus" of either set of claims.  It cannot be objectively concluded that the events leading to Denise Hughes's termination and the later developments arising from the contact with Bob Hughes's employer by Region VII Agency's lawyers "comprise but one case."

Although section 1367(a) permits the joinder of co-plaintiffs whose claims are related and form the same case and controversy, *see Monroe v. Brown*, 256 F. Supp. 2d 1292 (D. Ala. 2003) (finding supplemental jurisdiction over co-plaintiff husband's claims for loss of consortium where the court had original jurisdiction over wife's personal injury claim), when a co-plaintiff seeks to join a lawsuit with a free-standing, independent claim that is based on new legal theories and additional, unrelated facts, he must establish an independent basis for subject matter jurisdiction. *See Siegel v. Consol. Edison, Inc.*, 318 F. Supp.2d 176, 178-79 (S.D.N.Y. 2004) (holding that court had no supplemental jurisdiction over claim by shareholder for breach of merger agreement that was the subject of the dispute between the merger partners over which the district court had subject matter jurisdiction).  Bob Hughes's claims are separate from those of his wife, and he would not "be expected to try them in one judicial proceeding." *Michigan Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 355 (6th Cir. 2003).  The Court believes that section 1367(a) provides no statutory authority for Bob Hughes to join this lawsuit as a co-plaintiff with his wife's section 1983 claim.

C.

The Agency defendants also moved for sanctions against the plaintiffs' attorney on the grounds that the claims were unwarranted under existing law because the Region VII Agency is not a state actor, and other claims, especially those of Bob Hughes, were frivolous and brought solely for the purpose of harassment. The Court will not exercise subject matter jurisdiction over the claims by Bob Hughes. The Court finds that the allegation of state action by Denise Hughes is well grounded in existing law and the facts of this case. The motion for sanctions, therefore, will be denied.

III.

After conducting a *de novo* review of the record in light of the parties' objections, the Court is satisfied that the defendants' motions for summary judgment should be denied. The magistrate judge did not correctly apply the governing precedent to the facts as presented by the parties.

Accordingly, it is **ORDERED** that the plaintiffs' objections to the magistrate judge's report and recommendation are **SUSTAINED.**

It is further **ORDERED** that the magistrate judge's report and recommendation [dkt # 39] is **REJECTED**.

It is further **ORDERED** that the defendants' motions for summary judgment [dkt ## 12, 22] are **DENIED**.

It is further **ORDERED** that the defendants' motions for sanctions [dkt ## 21, 33] are **DENIED**.

It is further **ORDERED** that the plaintiffs' motion for enlargement of time to respond to the sanctions motion [dkt # 29] is **DENIED as moot**.

-22-

It is further **ORDERED** that the claims in the amended complaint by plaintiff Bob Hughes are **DISMISSED WITHOUT PREJUDICE** for want of jurisdiction.

It is further **ORDERED** that the parties appear for a status conference on **Thursday, May 11, 2006 at 4:00 p.m.** to discuss further case management.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: March 28, 2006

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 28, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS